FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2005 JUN 22 AM 10: 49

CLERK _____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 105-015 |
| | ) | |
| JOHN EARL MILLER | ) | |

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

The United States of America ("the Government") has accused Defendant John Earl

Miller ("Miller") of committing several armed robberies. Miller has now moved to suppress

evidence obtained during a search of his vehicle on July 7, 2004. (Doc. nos. 15, 27). Miller

also seeks the suppression of certain post-arrest statements he made to law enforcement

officers, arguing that the officers ignored his request for an attorney by continuing to question

him. (Doc. no. 26). The Government has filed responses to Miller's motions. (Doc. nos. 25,

28). On May 10, 2005, the Court conducted an evidentiary hearing and heard oral argument

on these matters. Upon due consideration of the relevant testimony and evidence, as well as

the arguments of counsel, the Court **REPORTS** and **RECOMMENDS** that Miller's motions

to suppress evidence obtained during a search of his vehicle on July 7, 2004 and any post-

arrest statements (doc. nos. 15, 26, 27) be **GRANTED**.

### I. BACKGROUND

**A.     Miller's Version of the Events**

In a brief affidavit, Miller contends that on July 7, 2004, he and a friend, Miss Kelly

Barton ("Barton") were "seated in a Chrysler PT Cruiser talking." (Doc. no. 27, p. 7). A

police officer approached the vehicle "and requested that they step outside where upon [sic]

the police officer attempted to question them and also search the vehicle." (Id. at 8). According to Miller, neither he nor Barton were engaged in any illegal activity, and at no time did either of them "give any consent to search" the car "to any police officers." (Id.). Miller did not testify at the evidentiary hearing or offer any other evidence. In a separate affidavit, Miller also provides that following his arrest, officers conducted an interrogation despite his repeated requests for an attorney. (Doc. no. 26, pp. 6-7).

## B.     The Government Witnesses' Version(s)

At the suppression hearing, the Government offered the testimony of three (3) narcotics investigators from the Richmond County Sheriff's Office ("RCSO") who were at the scene of Miller's arrest, namely Investigator Paul Godden ("Godden"), Investigator Jason Vincent ("Vincent"), and their supervisor, Lieutenant Robert Partain ("Partain"). The Court also heard testimony from Sergeant Scott Peebles ("Peebles"), a police officer working with the Violent Crimes Division of the RCSO. Following the arrest, Peebles obtained a state search warrant to search the PT Cruiser, participated in Miller's post-arrest interrogation, and testified before the federal grand jury. It will be helpful to briefly summarize their testimony.

### 1.     Investigator Godden

#### a.     Godden's Account of the Events

Godden, the first of the Government's witnesses, described encountering Miller and Barton in an empty lot behind a Days Inn on Washington Road in Augusta, Georgia, at approximately 9:00 p.m. on July 7, 2004. Hearing Tr., pp. 4-5 (found at doc. no. 32). Godden, who was part of a team of narcotics investigators patrolling the area in unmarked cars, noticed a Chrysler PT Cruiser occupied by a man and a woman, parked in an secluded, "wooded dirt lot" used "for construction equipment and storage" behind the Days Inn and its

2

adjoining parking lot. Id. at 5. Suspecting a "prostitution transaction," Godden approached the vehicle and got out of his car.[1] Id. Godden then got out his badge, approached the driver's side--where Barton was seated--and began asking Miller and Barton questions. Id. The pair told Godden their names, and Miller, who was in the passenger seat, indicated that he owned the car. Godden also illuminated the cabin with his flashlight and asked the occupants for their driver's licenses so he could verify their names. Id. at 5, 12-13. According to Godden, he did not ask either Miller or Barton to exit the car. When Godden asked them what they were doing, Barton explained that they were about to get a room at the hotel. Id. at 5.

Upon learning their identities and allaying his suspicion of illegal activity, Godden told them to leave the lot, and began to drive out of the empty lot and into the Days Inn parking lot. Id. at 6. Godden believed that he had made clear that Barton and Miller were free to leave at this point and the investigatory stop had ceased. Id. at 11, 17. According to Godden, the entire encounter in the empty lot lasted only "a couple of minutes." Id. at 6. Barton and Miller then followed Godden back to the Days Inn parking lot in the PT Cruiser.

Nevertheless, thinking that he remembered Barton's name, Godden radioed the other members of the narcotics team to ask why her name sounded familiar. Id. Vincent, an investigator in a nearby car, immediately responded by informing Godden that Barton had been previously prosecuted for manufacturing methamphetamine and starting hotel fires. Id. The narcotics team's supervisor, Lieutenant Partain, then asked whether Godden was still with Barton. Id. When Godden indicated that Barton was following him into the hotel

---

[1] Although part of a narcotics team patrolling the area, Godden was "riding solo." Hearing Tr., p. 4.

parking lot, Partain ordered Godden to stop the PT Cruiser so that Partain could question Barton further. Id.

Godden stopped his vehicle, walked back to the PT Cruiser, which was directly behind him, and told Barton "somebody" wanted to talk to her. Id. Nearly simultaneously, Partain and Vincent arrived on the scene.[2] Godden asked Barton to exit the vehicle, and she, Partain, and Godden stood at the rear of the PT Cruiser while Partain questioned her. Id. at 6-7. Vincent stood next to the passenger door and had a conversation with Miller that Godden could not hear. Id. at 7.

Godden then heard Vincent say "gun."[3] Id. Godden left Partain with Barton and approached the passenger side of the car, where he saw that Vincent had indeed recovered a handgun from the car and removed Miller from the car as well. Id. Godden noticed that Miller was strangely dressed, wearing a dark "jumpsuit like a mechanic would wear" over street clothes--despite the fact that it was hot summer evening.[4] Id. After the plain view

---

[2]In fact, Godden's entire narcotics team responded to the scene. In addition to Partain, Godden, and Vincent, Godden indicated that at least two (2) other narcotics investigators were there. Hearing Tr., p. 17. Godden also indicated that Investigator James Graham of the Violent Crimes Division of the RCSO and Officer Scott Redmond, who handled a canine unit, arrived at some point during the stop and arrest, though Godden could not remember when either of them arrived. Id. 14, 16. As discussed *infra*, Vincent and Partain also testified that they were accompanied by additional officers. Simply put, within seconds of the second stop, the PT Cruiser was surrounded by several police officers.

[3]Godden took some pains to explain in his testimony that he only heard Vincent say the single word "gun." Godden explained, "I heard Investigator Vincent say 'gun.' That's something we would normally use. We don't normally say, 'He's got a gun. He's got a gun.' We'll just say the word 'gun,' which means that a gun has been introduced by some means into the scenario." Hearing Tr., p. 7.

[4]It should be noted that Godden did not notice anything unusual about Miller until after Vincent removed him from the car. Id. at 13, 15. Simply put, Godden admitted that once his fears regarding a "prostitution transaction" were allayed, he had no suspicion regarding Miller until after the gun was found and Miller was pulled from the car wearing his strange outfit. Id. at 15.

4

sighting of the gun, and aware that Miller was a convicted felon, the officers then arrested Miller, searched the car, and discovered assorted robbery paraphernalia.[5] Id. at 8-10, 14. Following the search, Godden took photographs of the evidence found in the car (which were placed into evidence as Gov't's Exs. 1-8) depicting, *inter alia*, 1) Miller in his mechanic's outfit, 2) a bandana, handgun, and ski mask on the roof of the PT Cruiser, and 3) a baseball cap, a pair of binoculars, and surgical gloves. Id. at 8-9, 15.

Believing the narcotics team had apprehended the suspect in a string of recent armed robberies, Godden contacted Sergeant Peebles of the RCSO Violent Crimes Division. Id. at 9. Investigator James Graham ("Graham"), a "firearms investigator," then responded to the scene, although Godden could not recall when he arrived. Id. at 14. Godden expressed his belief that Peebles and the Violent Crimes Division took over the investigation, obtained a search warrant from a state judge, and conducted a more thorough search of the vehicle at a later time. Id. at 10.

### b.    Problems in Godden's Testimony

Unfortunately, Godden's details regarding the stop, the arrest, and the incident search are sketchy at best. In addition, Godden admitted that the key events were not reflected in his report of the incident, which Godden wrote only twenty (20) minutes after the initial stop. Id. at 13. First, Godden (the only officer to prepare a contemporaneous record of the events) admitted that his report contains no reference to the "first contact" or "initial encounter" with Miller and Barton in the empty lot. Id. at 10. Godden also admitted that his report states that the officers performed a "consent search" of the vehicle, even though no such consent was

---

[5]Strangely, as discussed *infra*, the officers did not arrest Barton, whom they also knew to be a convicted felon. Id. at 15.

ever actually obtained. Id. at 10, 13-14. The report asserts that the handgun and the evidence which Godden photographed were seized in this "consent search." Id. at 13. The report makes no reference to any plain view sighting of a gun or a search incident to arrest.[6] Id.

Confusingly, Godden attempted to explain this contradiction by stating, "At the time I did the report, I assumed that somebody got consent . . . [I]t wasn't until later that I actually confirmed the information with Investigator Vincent that I realized it wasn't a consent search . . .[but by then] I had already turned the report in."[7] Id. at 14. Next, Godden denied that he searched the car, although he could not indicate who actually did perform the search incident to the arrest. Id. at 15. This seems odd in light of the fact that Godden observed Miller being removed from the car and acknowledged taking photographs of the evidence at the scene, events which presumably occurred before and just after the search.[8] Id. at 8-9, 14-15. Strangely, Godden also contended that no "full search" of the car was conducted until later, when Sergeant Peebles obtained a search warrant. Id. at 10. However, Peebles "never came to the scene" and did not participate in the arrest and incident search. Id. at 14.

Also, on cross examination Godden stated that a canine unit working with the narcotics team had performed a "free air" search and alerted on the vehicle. Id. at 16.

---

[6]In addition to contradicting his own report, as discussed *infra*, Godden's testimony also contradicted affidavits submitted in support of state warrants for the search of the PT Cruiser and Miller's arrest. Of particular note, in his sworn affidavit in support of the arrest warrant, Godden informed a state judge that he had discovered the handgun *himself*. See discussion *infra* at pp. 17-18.

[7]As discussed *infra*, Godden's statement regarding "confirming" the events with Vincent is contradicted by Vincent's testimony that he did not correct Godden's apparent misapprehension. See id. at 25.

[8]Godden also remembered making written notes of what was removed from the car. Id. at 15.

6

Curiously, Godden could not recall whether the dog alerted on the PT Cruiser before or after the gun was discovered, although he thought it occurred afterward. Id. at 16, 17. The canine search, like the "plain view" discovery of the gun and search incident to arrest, was not mentioned in Godden's report.[9] Id.

Simply put, Godden's testimony begs obvious questions regarding the timing and circumstances of the search. The Court wonders how Godden, who was present at the search, photographed the fruits of the search, and prepared the only written report of the search, could be so uncertain and unfamiliar with the details of what actually occurred--not to mention how Godden managed to prepare a report within minutes of Miller's arrest which flatly contradicts his hearing testimony.

### 2. Investigator Vincent

That having been stated, much of Godden's testimony is corroborated by that of Investigator Vincent. Vincent testified that he was in an unmarked car on Washington Road, having just pulled out of the Days Inn parking lot, when he heard Godden over the radio asking about Barton.[10] Hearing Tr., p. 19. Vincent informed Godden of Barton's criminal history. Partain then ordered Godden to stop Barton. Vincent turned around and was in the Days Inn parking lot within seconds. Id. Vincent went to the passenger side of the PT Cruiser, and began talking to Miller. Noting that Miller was oddly dressed considering the hot weather, Vincent began illuminating the inside of the car with his flashlight. Id. at 20. At this point, Vincent noticed the handle of a pistol between Miller's feet. Id. Vincent

---

[9]Godden indicated at the hearing that no drugs were ever found; neither does his report mention the presence or absence of drugs. Id. at 17.

[10]Vincent was riding with his partner, Investigator "Shedre Woods." Id. at 27.

opened the door and retrieved the gun while telling the other officers, "I've got a gun over here." Id. at 21. Vincent then ordered Miller out of the vehicle, and while talking to Miller, Vincent discovered that Miller was a felon on supervised release and arrested him. Id. at 20. Vincent also noticed a grey ski mask on the floorboard where the gun had been seen; he placed both the gun and ski mask on the roof of the car. According to Vincent the entire period from his arrival on the scene to his arrest of Miller took "just a couple of minutes." Id. at 21.

Vincent then spoke to the other officers and related how he had discovered the gun. However, Vincent denied searching the car or removing any items from the vehicle other than the gun and the ski mask. Id. at 21. Vincent also explicitly stated that no consent to search was ever obtained, but that any search would have been incident to arrest. Id. at 23, 24. In fact, Vincent explained that he waited for "someone from CID to come process the car" rather than search it himself. Id. More importantly, contrary to Godden's testimony, Vincent indicated that Godden "scanned" and "went through" the vehicle. Id. at 24. Vincent also did not recall whether a canine unit was present on the scene at all or whether drugs had been discovered. Id. at 22, 25. Most troubling, on cross examination Vincent admitted seeing Godden's mistaken report, but stated that he never thought to discuss the matter with Godden.[11] Id. at 25. This statement directly contradicts Godden's testimony, discussed *supra,* that after Godden turned in his report, Vincent informed him that no consent to search was ever obtained. See id. at 14.

---

[11]Vincent also explained that he did not prepare a written report or write any notes regarding the incident himself, but that he referred to Godden's report and notes to refresh his memory of "dates and times." Id. at 25.

### 3.    Lieutenant Partain

After hearing from Godden and Vincent, the Court heard testimony from Lieutenant Partain, their supervisor. Partain was also in the area, in a car with two (2) other investigators. Id. at 27. Partain described ordering Godden to stop Barton so that he could question her. Id. at 28. At the time, Partain was aware that Godden had concluded the initial encounter and released Barton and Miller. Id. at 34. Partain knew that Barton had once been involved in manufacturing methamphetamine in nearby hotels on Washington Road and in starting hotel fires.[12] Id. at 28. Partain specifically explained that he wanted to question Barton and make a "contact." Id. Partain spoke with Barton at the rear of the PT Cruiser with Godden while Vincent approached Miller in the passenger seat. Partain then heard Vincent say, "He's got a gun," and Partain saw Vincent with the gun as he removed Miller from the car. Id. at 29. Vincent then explained to Partain how he had seen the gun. Id.

However, Partain was "focused" on Barton, so he did not recall further details concerning Miller's arrest or the search of the vehicle. Id. Instead, Partain searched Barton's purse, with her permission, and discovered a small amount of methamphetamine. Partain decided to try to use Barton to go after "another target," so he did not arrest Barton.[13] Id. at

---

[12]Interestingly, Partain also provided that he was familiar with the wooded lot where Miller and Barton were found because he had used the area before "to meet informants." Id. at 33.

[13]Lieutenant Partain is well-known to the Court, having distinguished himself over the past twenty-five (25) years in countless narcotics cases prosecuted in federal court. He is also very familiar with the prohibition against using federal probationers and supervised releasees as informants without prior court approval. Barton's supervised release included the following standard condition: "the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court." Barton v. United States, CR 101-077, doc. no. 38, p. 3 (S.D. Ga. May 6, 2002). During the hearing and upon questioning by the Court, Partain affirmed this understanding but stated that he decided to ignore the court order in order to "do a quick hit." Hearing Tr., p. 35. Accordingly, no effort was made to notify the United States Probation Office that Barton, who was serving a sentence on supervised

9

29-30. Partain did remember the canine unit being there, but could not recall whether the dog alerted on the vehicle. Id. at 30. Partain did not prepare a report, despite being the supervising officer on the scene. Id. at 31. Partain, like Godden and Vincent, explained that no consent to search the vehicle was ever obtained. Id. at 33.

### 4. Sergeant Peebles

Sergeant Peebles of the Violent Crimes Division, the last of the Government's witnesses, testified that he was investigating a string of robberies when he got a "phone call" from Paul Godden on July 7, 2004. Id. at 37. Agreeing with Godden that Miller was a viable suspect in the robberies, Peebles sent Investigator James Graham to the scene of Miller's arrest. Id. at 37. Peebles indicated that the narcotics team had recovered various items, including a gun, ski mask, bandana, surgical gloves, and binoculars from the PT Cruiser. Id. at 37-38, 40. Peebles also indicated that the car was towed to an impound yard on the night of the arrest. Id. Two (2) days after the arrest, Peebles obtained a search warrant to search the car. Id. at 40. Inexplicably, the affidavit Peebles used to obtain the warrant indicated that

---

release for manufacturing methamphetamine, was in the company of Miller (who has no less than fifteen (15) felony convictions) while "casing" a motel for an armed robbery. Likewise, no effort was made to make it known that Barton, once found to have set both homes and local motels on fire while attempting to manufacture methamphetamine, was again possessing the substance in user quantities.

Notwithstanding Partain's intent to "do a quick hit," his incomprehensible failure to charge Barton and his decision to release her without notifying her probation officer resulted in yet more criminal mischief by Barton. Simply put, Partain's abdication of his well-known, official obligations made possible even further violation of the conditions of Barton's release. The United States Probation Office has informed the Court that Barton was arrested in Wadley, Georgia, peddling crack cocaine and possessing with intent to distribute in excess of eighty-eight (88) grams of crack cocaine on September 2, 2004. Having thus been charged, Barton again inexplicably gained her release. Barton was released on a $5,000.00, ten percent bond--despite a call from the United States Probation Office asking Jefferson County officials to hold Barton until a warrant for her arrest for multiple violations of her conditions of supervised release could be obtained. Since her release, Barton has not been seen or heard from and is now a state and federal fugitive.

he hoped to find a handgun, surgical gloves, a ski mask, and other items which Peebles knew the narcotics team had already seized from the vehicle. Id. at 45-46.

More disturbing, the affidavit indicated that Godden obtained permission to search the car and recovered a handgun. Id. at 46. According to Peebles, he had spoken with Godden twice regarding Miller's arrest before securing the warrant, and he "understood" Godden to have indicated that the search was based on verbal consent. Id. at 46-47. Peebles also admitted that, while testifying before the federal grand jury, he indicated that Miller had given Godden a "signed" consent to search the vehicle. Id. at 47, 48. At the hearing, Peebles attempted to explain this statement by stating that he "misspoke" and was intending to tell the grand jury about a property receipt Miller had signed. Id. at 48.

Peebles also testified regarding Miller's post-arrest interrogation. Peebles explained that on the morning following Miller's arrest, he and Ron Rhodes ("Agent Rhodes"), an agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), secured Miller in an interview room at the RCSO and Mirandized him. Id. at 41. When Peebles began asking Miller about local robberies, Miller requested an attorney. Id. Peebles and Agent Rhodes then asked Miller if he would be willing to discuss his acquisition of the handgun, whereupon Miller described his "street purchase" of the firearm. Id. at 41-42.

## C.    Arguments of Counsel

Following the testimony of the Government witnesses, the Court heard oral argument on the matter. Miller, through counsel, contended that given the inconsistencies between Godden's report, Peebles's search warrant affidavit, Peebles's grand jury testimony, and the Government witnesses' current account of a "plain view" sighting of the gun and search incident to arrest, the Court should suppress all evidence recovered from the PT Cruiser. Id.

11

at 51. Miller also argued that any post-arrest statements he made should be excluded because he requested an attorney. (Doc. no. 26, p. 1).

The Government responded with the novel argument that although the PT Cruiser "did belong to" Miller, because Miller was not the driver of the car and the "target" of the second stop, Miller does not have "standing" to challenge the search. Hearing Tr., pp. 49-50. The Government also characterized the second stop as a "consensual encounter" between the police and Barton. Id. at 49. Indeed, the Government presented in its written response to Miller's motion that the gun was seen in "plain view" during a "non-coercive encounter" and that the other items recovered were found during a "consent search." (Doc. no. 28, pp. 2-3). In addition, the Government emphasized that the entire incident, from Godden's discovery of the PT Cruiser in the vacant lot to Miller's arrest, took only a matter of minutes. Hearing Tr., p. 50. Finally, as to the post-arrest statements, the Government contended that it does not intend to use the statements as part of its case in chief, but that the statements are admissible for the purpose of impeachment under Harris v. New York, 401 U.S. 222 (1971). (Doc. no. 28, p. 4).

## II. DISCUSSION

### A. The Respective Burdens of the Parties

As a general matter, a defendant contending that a search violated his Fourth Amendment rights must demonstrate that the search was illegal and that he had a legitimate expectation of privacy in the property searched. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). Nevertheless, "[u]pon a motion to suppress evidence garnered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution." United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983), *cert.*

*denied*, 465 U.S. 1023 (1984); see also United States v. Waldrop, 404 F.3d 365, 368 (5th Cir. 2005)("A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." (citation omitted)). Thus, "[t]he Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment [sic]." Freire, 701 F.2d at 1519; see also United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977). Accordingly, although Miller must demonstrate that the search implicated his Fourth Amendment rights, once he has done so, the burden shifts to the Government to show that an exception to the warrant requirement applies.

In general, the police may search an automobile without a warrant[14] under three (3) circumstances: 1) incident to the lawful arrest of an occupant of the vehicle, see Thornton v. United States, 541 U.S. 615, 124 S. Ct. 2127, 2129 (2004),[15] 2) based upon probable cause, see Pennsylvania v. Labron, 518 U.S. 938, 940-41 (1996)(*per curiam*), or 3) with valid consent, see Ohio v. Robinette, 519 U.S. 33, 39-40 (1996). It is clear from the record that neither Barton nor Miller ever gave the police consent to search the vehicle. Of course, a trained canine's alert on the vehicle (during a lawful stop which has not been unconstitutionally prolonged) constitutes probable cause to search the car for contraband, see

---

[14]Although Peebles obtained a search warrant, he did so only *after* the PT Cruiser had been searched and relevant evidence seized, rendering the warrant at best a nullity and at worst a sham.

[15]Of course, it should also be noted that once officers have conducted a lawful arrest of the occupant-owner of the vehicle, they may also lawfully impound the car and conduct an inventory search. See Arkansas v. Sullivan, 532 U.S. 769, 770 (2001)(*per curiam*); Colorado v. Bertine, 479 U.S. 367, 368-69 (1987)(upholding inventory search of van after driver's arrest for drunk driving).

Illinois v. Caballes, __ U.S. __, 125 S. Ct. 834, 836-38 (2005); however, it is unclear from the record whether or when such a "free air" search was actually conducted. At any rate, the Government has not contended, either in its written response to the suppression motion or at oral argument, that the search was based upon probable cause. Rather, the Government has maintained that the search was conducted either with consent or incident to Miller's lawful arrest following a "plain view" sighting of a gun during a "consensual encounter" with the police. (Doc. no. 28, p. 3; Hearing Tr., p. 49). The Court will now take up the matters of Miller's "standing" and the legality of the search, in turn.

**B.     Miller Has "Standing."**

As noted, the Government argues that Miller is without "standing" to challenge the instant search because he was not "the driver" of the car. Hearing Tr., p. 49. The Court gives the Government's "standing" argument short shrift. See Rakas v. Illinois, 439 U.S. 128, 139 (1978)("But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.). As the Supreme Court has clarified, the relevant inquiry involves a two-part analysis: first, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and [second,] that his expectation is reasonable," that is, recognized and permitted by society. Minnesota v. Carter, 525 U.S. 83, 88 (1998).

It is true that one without a property or possessory interest in an automobile cannot contest its search. See Rakas, 439 U.S. at 129-143. However, the Government's argument ignores two key facts: 1) Miller, unlike the Government's "unlucky passenger," also asserts

ownership of the car;[16] and 2) Miller challenges a seizure which affected his liberty, see United States v. Grant, 349 F.3d 192, 195-96 (5th Cir. 2003); United States v. Lawson, 782 F. Supp. 1546, 1547-48 (S.D. Fla. 1992); see also United States v. Clark, 337 F.3d 1282, 1285 n.1 (11th Cir. 2003)(passenger ordered to remain in car was "detained" for Fourth Amendment purposes).[17] Given that Miller had both subjective and objectively reasonable expectations of privacy, as well as the fact that he challenges his own detention, it is clear that he possesses sufficient "standing" to challenge the search.

## C.    The Government Has Not Met its Burden.

The officers' actions in this case raise serious questions.  To begin, the host of inconsistencies, both material and immaterial, between the Government witnesses' testimony at the hearing and their prior versions of the events are a cause of great consternation for the Court.  In addition, the Court is persuaded that, even if the Government's version of the events is to be believed, the officers subjected Miller to an illegal detention.

### 1.    The Testimony of the Government Witnesses is Plagued by Credibility Problems.

Credibility determinations in suppression hearings belong to the hearing judge, and are entitled to deference unless they reflect an "unbelievable" understanding of the facts.[18]

---

[16]In fact, it is likely that a passenger-owner has greater privacy interests in the car than a non-owner driver. See, e.g., United States v. Jefferson, 925 F.2d 1242, 1248-49 (10th Cir. 1991).

[17]The majority of the Courts of Appeals have recognized that an automobile passenger may challenge the admission of evidence discovered as a product of his illegal detention. See United States v. Pulliam, 405 F.3d 782, 787 (9th Cir. 2005); United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2004); United States v. Ameling, 328 F.3d 443, 447 n.3 (8th Cir. 2003); United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001); United States v. Kimball, 25 F.3d 1, 5-6 (1st Cir. 1994); United States v. Rusher, 966 F.2d 868, 874 n.4 (4th Cir. 1992).

[18]It should also be noted that, as a general rule, "a district court must rehear the disputed testimony before rejecting a magistrate judge's credibility determinations." United States v. Cofield,

United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). In making a credibility determination, the Court must consider "the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750. The Government witnesses' interests are obvious, and the Court recalls nothing unusual about the demeanor of any of the witnesses.

Nevertheless, the Government witnesses' testimony offered obvious inconsistencies. The officers' accounts were inconsistent with each other, as well as with versions of the events recorded prior to the hearing (i.e., Godden's written report, sworn affidavits, and Peebles's grand jury testimony). Some of these differences--e.g., whether Vincent yelled the single word "gun" or said something else--appear fairly innocuous and should perhaps be expected, given that the events in question occurred months before the suppression hearing.

Even so, the witnesses' testimony was not unified on aspects of the incident which would have been memorable. For example, the Court finds it strange that the officers were uncertain regarding whether a canine search was performed or if the dog had alerted on the vehicle (by sitting down and barking, see Hearing Tr., p. 16). A "free air" search and alert by a drug dog presumably would have caught the attention of these narcotics officers, especially as it could have provided a basis for searching the PT Cruiser--which the officers knew was being driven by a felon with a history of drug offenses.

More troubling, the hearing testimony lends itself to the appearance that the officers changed their story between the return of the indictment and the suppression hearing. First, Godden admitted the obvious differences between his report and his hearing testimony.

---

272 F.3d 1303, 1306 (11th Cir. 2001)(per curiam).

Vincent also admitted reading Godden's report and noting the factual inaccuracies, but then never remarking on these discrepancies to Godden or seeking to correct any misapprehension regarding the search (contrary to Godden's testimony that he "confirmed" the events with Vincent). In addition, Peebles admitted that after speaking with Godden about what occurred, he submitted a sworn affidavit to a state judge and testified before the federal grand jury that a consent search had been performed.[19] Hearing Tr., pp. 46-47. Peebles even went so far as to tell the grand jury that the police obtained written consent, when in fact Miller had only signed a property receipt. Id. at 47-48. Thus, when Peebles submitted an affidavit and testified before the grand jury he was, at the very least, laboring under a mistaken view of the events.

Assuming Peebles faithfully related what Godden had told him about the incident, one wonders how Godden managed to provide such an inaccurate view of the events to Peebles and in his written report. Simply put, the Court is perplexed by the notion that Godden witnessed a fellow officer's plain view sighting of a gun, followed by an arrest and incident search, only to later record in his police report (and tell Peebles) that a consent search had been conducted. To be more precise, the Court finds it hard to believe that Godden would hear Vincent yell "gun," witness Vincent holding the gun and removing Miller from the vehicle, and then write in his report--only twenty (20) minutes after the events--that this same gun was found during a consent search.

---

[19]Furthermore, a portion of Peebles's grand jury testimony, attached to Miller's motion to suppress, demonstrates that Peebles told the grand jury that Godden approached the PT Cruiser, saw that Miller was strangely dressed, got suspicious, asked for permission to search the car, and found the gun and robbery paraphernalia. (Doc. no. 27, pp. 9-10). In contrast, at the hearing Godden testified that he never noticed Miller's odd clothing or "suspect[ed] Mr. Miller of anything" until after Vincent had discovered the gun. Hearing Tr., p. 15.

Godden's credibility is further harmed by the fact that on July 8, 2004, he presented

a signed, sworn affidavit in support of Miller's state arrest warrant, stating as follows:

> Personally came GODDEN, PAUL INV who on oath says that to the best of his personal knowledge and belief, MILLER-JR., JOHN EARL did on the 7th day of July, 2004 . . . commit the offense of: POSSESSION OF A FIREARM BY A CONVICTED FELON . . . *said gun was located by Augusta Richmond County Sheriff's Investigator Paul Godden as the defendant was a passenger of a Blue 2003 Chrysler PT Cruiser having the weapon concealed between his feet.*[20]

Ex. A, p. 1 (emphasis added). Thus, Godden has offered no less than three (3) versions of

the events: 1) that Godden discovered the gun himself, 2) that Vincent found the gun in

plain sight, and 3) that the gun was found during a consent search. It is well within the

Court's discretion to disbelieve an officer's suppression hearing testimony when that

testimony is directly contradicted by the officer's contemporaneous report of the events in

question.[21] Moreover, the Court has an even greater entitlement to disbelieve testimony

---

[20]The affidavit and arrest warrant were provided to the Court by the United States Probation Office, and are attached to this Report and Recommendation as Exhibit A. The affidavit and arrest warrant are matters of public record which may be judicially noticed by the Court. F.R.E. 201; Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1999)(court may take judicial notice of public records)(civil case). The Court is aware that no mention of the state arrest warrant was made during the suppression hearing; however, the affidavit nevertheless presents yet another sworn statement contradicting other statements made by Godden, sworn or otherwise.

[21]See United States v. de la Jara, 973 F.2d 746, 751-52 (9th Cir. 1992)(plain error to credit in-court testimony while rejecting conflicting contemporaneous report); United States v. Higareda-Santa Cruz, 868 F. Supp. 355, 356 (D. Or. 1993)(rejecting officer testimony which contradicted officer's contemporaneous report); see also United States v. Nobles, 422 U.S. 225, 232 (1975)(explaining that investigator's contemporaneous report can "provide critical insight" into the investigator's credibility); United States v. Clark, 184 F.3d 858, 865 (D.C. Cir. 1999)(officers failure to record incident in contemporaneous report "may call the credibility of their testimony into question"); Walker v. Nationsbank of Florida, N.A., 53 F.3d 1548, 1564 n.7 (11th Cir. 1995)(factfinder permitted to infer that witness is lying where testimony is directly contradicted by witness's contemporaneous report)(civil case); Complaint of F/V Capt. Wool, Inc., 914 F. Supp. 1300, 1304 (E.D. Va. 1995)(rejecting testimony that contradicts contemporaneous report)(civil case).

which conflicts with the officer's prior *sworn* account of the events.[22]

Here, the officers' hearing testimony is contradicted by Godden's report and conversation with Peebles (which both occurred within hours of Miller's arrest), Peebles's grand jury testimony, as well as Godden's own sworn affidavit (presented to a state judge the day after Miller's arrest). In light of the conflicting contemporaneous statements and hearing testimony, it would be within the Court's discretion to discredit the officers' testimony entirely.[23] Such a conclusion would be further bolstered by Vincent's claim that he knew of the erroneous report, but did nothing to correct Godden's error. Finally, Sergeant Peebles's attempt to obtain a search warrant after the fact, dismissed by the Government as harmless, does not pass the smell test.

Of course, it should also be noted that Miller's affidavit does not present a clear picture of what occurred either. Miller's affidavit does explain that while Barton and Miller were sitting in the PT Cruiser, a police officer approached, questioned them, and ordered

---

[22]To illustrate, in the summary judgment context, it is well-settled that a civil litigant may not generate an issue of material fact simply by submitting an affidavit or deposition testimony which squarely contradicts his prior sworn statements. See, e.g., McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n. 4 (11th Cir. 2003)(court may disregard affidavit which directly contradicts prior deposition testimony); O'Ferrell v. United States, 253 F.3d 1257, 1270 n. 6 (11th Cir. 2001)(prior affidavit undermined by affiant's subsequent deposition testimony). The general principle applies here as well--a witness's credibility is suspect when he contradicts his own prior sworn statements.

[23]It should be noted that although witness testimony can generally be accepted and rejected in part, "there comes a point where fragmentation becomes illogical" and the witness's entire version of the events "collapses." Sylvia v. United States, 312 F.2d 145, 147 n.1 (5th Cir. 1963)(citation and quotation omitted). The officers' testimony here concerned a "single, indivisible episode" and thus "should be accepted or rejected in its entirety." United States v. Garner, 581 F.2d 481, 486 (5th Cir. 1978)(quoting Sylvia, 312 F.2d at 147). The Court is entitled, based on its "overall assessment of [the officers'] credibility, to "wholly disbelieve" their testimony. Loper v. Beto, 405 U.S. 473, 502 (1973)(Rehnquist, J., dissenting). Indeed, it would be questionable for the Court to rest its findings on testimony it has already deemed incredible in important aspects. See United States v. Forbes, 181 F.3d 1, 7-8 (1st Cir. 1999).

them out of the vehicle in order to conduct a search "without probable cause." (Doc. no. 27, pp. 7-8). Unfortunately, the affidavit is so brief that it is more a conclusion than a factual statement. The affidavit does not explain what the "officer" asked them, why he ordered them out of the vehicle, or why the search occurred. Thus, it appears the actual circumstances of Miller's arrest and the search of the vehicle remain shrouded in mystery.

Under these circumstances, it may be argued that even if the officers' account of the events has been undermined, the search cannot be questioned because Miller has put forth no allegations of his own demonstrating his rights were violated. However, such an argument misapprehends the Government's burden of proof in this case to justify a warrantless search. Given the problematic testimony of the Government witnesses, the Court finds that the Government has not shown by a preponderance of the evidence that the search was reasonable.

### 2. Even Assuming the Government's Version of the Events is True, the Search Was Illegal.

Furthermore, the Court is persuaded that, even assuming that the officers' latest version of the events is accurate, the evidence is inadmissible because it was discovered during an illegal detention. The Government maintains that the gun was discovered in "plain view" during an investigative stop which had become a consensual encounter between Barton and the police. (Doc. no. 28, p. 3; Hearing Tr., p. 49). The plain view doctrine "permits law enforcement officers the full use of their eyes in places the officers have a right to be." O'Rourke v. Hayes, 378 F.3d 1201, 1208 (11th Cir. 2004)(quotation and citation omitted). When law enforcement officers conduct a lawful investigatory stop, they are entitled to be on the scene and the plain view doctrine applies. See United States

v. Hensley, 469 U.S. 221, 235 (1985); United States v. Desir, 257 F.3d 1233, 1236 (11th Cir. 2001); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). However, the plain view doctrine cannot be applied to evidence seen during an illegal stop, or an initially legal stop which has matured into an illegal detention. See Texas v. Brown, 460 U.S. 730, 737 (1983)("The question whether property in plain view of the police may be seized therefore must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question."); United States v. Davis, 94 F.3d 1465, 1470 (10th Cir. 1996)(plain view doctrine inapplicable to evidence seen during illegal detention).

When a police officer conducts an investigatory stop based on less than probable cause, the "intrusion must be temporary and last no longer than is necessary to effectuate the purpose of the stop and the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion." United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004)(citation and quotation omitted). The detention cannot be prolonged without some articulable suspicion of "other illegal activity." Id. If the detention continues after the "legitimate investigative purposes of the [] stop have been fulfilled," it becomes illegal. Id.

In this instance, the Court is persuaded that the stop became illegal before the gun was sighted. The reasonableness of an investigative stop turns on two inquiries: 1) whether the stop was reasonable at its inception, and 2) whether the stop became unreasonable in its scope or duration. See United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). A reasonable, articulable suspicion to justify a stop can be based on the "collective" knowledge of all the officers involved in the stop. Acosta, 363 F.3d at 1145. Here, Godden observed a man and

a woman parked in a dark, secluded area not intended for vehicular traffic and suspected a "prostitution transaction." This clearly gave Godden an articulable and reasonable suspicion entitling him to approach the car and investigate further.[24]

However, the police officers behaved unreasonably when, after Godden's suspicions had been allayed and he had told Barton and Miller that they could leave, the officers stopped the car again and resumed the detention so that they could question Barton for reasons unrelated to the initial stop. See United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999)(further questioning unrelated to initial stop must be supported by reasonable suspicion). The officers did not have any reasonable suspicion of "other illegal activity" or any safety concern regarding Barton or Miller. The only "new" reason used to justify stopping the car again was Vincent and Partain's knowledge of Barton's prior criminal record. Of course, the renewal of the detention was actually motivated not by belief that a crime was afoot, but by Partain's desire to "make a contact."

While Godden may have prolonged the initial stop in order to discover information about Barton and Miller's criminal histories for his own safety, the Court is not persuaded that his discovery of Barton's criminal history--after releasing Barton and Miller--entitled him to renew the detention. In United States v. Boyce, the Eleventh Circuit considered a similar situation. 351 F.3d 1102, 1107 (11th Cir. 2003). In Boyce, an officer stopped Boyce for a traffic violation. After returning Boyce's driver's license and telling Boyce he was free to go, the officer requested a criminal history check on Boyce. Id. at 1107. The Eleventh

---

[24]Moreover, even if these facts would not give rise to a reasonable suspicion, they gave Godden sufficient reason to approach and ask questions. See United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003)(explaining police do not always need articulable suspicion to approach and ask questions).

Circuit explained:

> Once [the officer] had completed writing the warning citation and returned Boyce's license and rental agreement, the traffic violation investigation was complete and, as [the officer] admits in his testimony, Boyce was free to go. R2 at 57.
>
> [The officer] did not request the criminal history check until several minutes after he had written the warning. Therefore, the criminal history check could not be part of the original traffic stop investigation and could not be the basis for prolonging Boyce's detention. Once the traffic stop was at an end, [the officer] should have let Boyce go unless he had a reasonable and articulable suspicion of some other criminal wrong doing.

Id.

Likewise, in the instant case, Godden questioned Barton and Miller, and then returned their licenses and allowed them to leave. The only substantive difference in the instant case is that it reportedly only took "seconds" for Godden to learn that Barton had a prior drug conviction and revive the stop. However, because Godden had already let Barton and Miller leave, his radio conversation could not serve as a reason to prolong or renew the detention absent "reasonable suspicion" of other criminal activity. The mere awareness that Barton had committed past crimes involving hotels, while perhaps supporting a hunch or inchoate suspicion, falls well short of providing an independent basis for renewing the stop. See United States v. Perkins, 348 F.3d 965, 971 (11th Cir. 2003)(mere "hunch," even if later proved correct, not sufficient to support prolonged detention).

Of course, it could be argued that knowledge of Barton's criminal history, coupled with her location behind the Days Inn, gave rise to a reasonable suspicion supporting the renewal of the detention. The Court is not persuaded. First, the sighting of a convicted drug offender in an area known for drug crimes alone is insufficient to give rise to reasonable

suspicion.[25]   In <u>United States v. Sprinkle</u>, the Fourth Circuit addressed an analogous situation.  106 F.3d 613, 617 (4th Cir. 1997).  In <u>Sprinkle</u>, an officer sighted a recently released narcotics offender huddled with a passenger in a car in an area known for narcotics crimes.  <u>Id.</u>  When the officer approached, the ex-convict put his head down, covered his face with his hand, and then drove away before the officer could come closer--the officer then performed an investigatory stop.  <u>Id.</u>  The Fourth Circuit explained that while this situation certainly appeared "suspicious," these facts alone could not generate reasonable suspicion when the officer's observations did not reveal that anything "of a criminal nature was happening in the car."  <u>Id.</u> at 618.

The situation here is similar in that Godden's initial encounter likewise failed to reveal "particularized evidence" that a crime was afoot.[26]   <u>Id.</u>  Godden had already illuminated the vehicle with his flashlight, questioned the occupants of the vehicle, checked their driver's licenses, and let them go.  His observations of Barton and Miller had dispelled, rather than fostered, any suspicion of illegal activity.  The purpose of the detention had been fulfilled.  The fact that it only took a brief period of time for the narcotics team to stop the car and resume the detention is irrelevant given these facts.  Thus, the plain view sighting

---

[25]<u>See Davis</u>, 94 F.3d at 1467-70 (10th Cir. 1996)(presence of suspected drug dealer and known gang associate at entrance of "juice joint" and "scene of gang disputes" alone did not give rise to reasonable suspicion to detain suspect, rendering later plain view sighting of suspect's gun in automobile the product of an illegal detention); <u>United States v. Packer</u>, 15 F.3d 654, 658-59 (7th Cir. 1994)(presence of four men in parked suspicious car with fogged windows late at night did not give rise to reasonable suspicion).

[26]Of course, the Court is aware that the incident in <u>Sprinkle</u> occurred on a street in the late afternoon, rather than in a wooded lot at night.  <u>Id.</u> at 617.  Nevertheless, the legal proposition of <u>Sprinkle</u> still applies--absent "particularized evidence" of criminal activity, the police may not detain an individual solely because of his criminal history and location in a suspicious place.  The issue is even more clear here, where Miller's detention was based not on his own criminal history, but Barton's.

24

of the gun was the product of an illegal detention.

In United States v. Starks, the district court dealt with a strikingly similar case. 301 F. Supp.2d 76, 78 (D. Mass. 2004). In the early morning hours, while patrolling an area known for narcotics trafficking, police sighted a black Jeep Grand Cherokee occupied by a man and a woman on an access road which served a Holiday Inn. Id. at 78-79. Noticing that the "rear license plate light was not illuminated," the officers pulled the Jeep over in the Holiday Inn parking lot. Id. at 79. The officers asked for the driver's licenses of the driver, and Starks, the passenger. Id. The officers subsequently learned that the driver's license of the Jeep's driver was suspended. Id.

While Starks was made to wait in the Jeep, the officers wrote the driver a ticket, and after issuing the citation told the driver she was free to leave. Id. Immediately after issuing the citation, the officers learned that the driver "had a pending drug trafficking case." Id. The officers obtained permission from the driver to search the vehicle; they then searched the car and conducted a "pat frisk" of Starks, discovering a pistol on his person. Id. at 80. The court concluded that although the initial stop was valid, Starks's detention became illegal when the officers detained him after the purpose of the stop (the issuance of the citation to the driver) had ended. Id. at 83. The only new information used to detain Starks was the fact that the driver was involved in a drug trafficking case and had consented to a search of the vehicle. Id. Thus, by the time the officers conducted the pat-down, Starks's detention had already become illegal. Id. at 85. Likewise, the officers' decision here to detain Miller while they questioned Barton was unreasonable because it occurred after the investigatory stop had been concluded.

Of course, the Government attempts to characterize this second stop not as a

resumption of the detention, but as a "consensual" encounter between Barton and the police. This argument is unconvincing. Acting upon Partain's orders to stop Barton, Godden stopped his car and waved down the PT Cruiser. According to the police officers, within seconds the car was surrounded by the entire narcotics team (a total of six officers), who arrived in two additional cars. Without taking into account that a canine unit and another investigator also reportedly arrived on the scene at some point, it is clear that no reasonable person would have felt free to leave under these circumstances.[27] It is also objectively clear that Miller and Barton had been accosted and were not free to walk away. Perkins, 348 F.3d at 969 (seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away").

In sum, the second encounter was an illegal detention, not a consensual encounter with the police. That is, the detention became unreasonable when the officers stopped the PT Cruiser a second time, violating Miller's Fourth Amendment rights. As this occurred prior to any plain view sighting of the gun, the evidence seized is fruit of an illegal detention and must be excluded. Likewise, any post-arrest statements made by Miller are also fruit of the poisonous tree.[28]    See Wong Sun v. United States, 371 U.S. 471, 485-86 (1963)(evidence, including statements, discovered as a result of earlier Fourth Amendment violation is tainted); United States v. Chanthasouxat, 342 F.3d 1271, 1281 (11th Cir.

---

[27]In assessing whether an encounter constitutes a "seizure" or a mere police-citizen communication, the Court considers whether a reasonable person would have believed he was free to leave. United States v. Espinosa-Guerra, 805 F.2d 1502, 1507 (11th Cir. 1986); see also I.N.S. v. Delgado, 466 U.S. 210, 215 (1984).

[28]Of course, as it is undisputed that Peebles and Agent Rhodes continued to question Miller after he had requested an attorney, the statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436, 458-71 (1966), and are also subject to suppression on that basis.

2003)(same).

### III.  CONCLUSION

For the above reasons, the Court **REPORTS** and **RECOMMENDS** that Miller's motion to suppress evidence obtained during a search of his vehicle on July 4, 2004 be **GRANTED**.  (Doc. nos. 15, 27).  The Court also **REPORTS** and **RECOMMENDS** that Miller's motion to suppress his post-arrest statements be **GRANTED**.  (Doc. no. 26).

SO REPORTED and RECOMMENDED this *23rd* day of June, 2005, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

STATE OF GEORGIA ) 

COUNTY OF RICHMOND )

ORIGINAL

# AFFIDAVIT

Personally came GODDEN, PAUL INV who on oath says that to the best of his personal knowledge and belief, MILLER-JR. JOHN EARL. did, on the 7th day of July, 2004 at approximately 09:00PM in Richmond County, Georgia, commit the offense of: POSSESSION OF A FIREARM BY A CONVICTED FELON in violation of O.C.G.A. 16-11-131, a FELONY under the Laws of the State of Georgia, in that said accused on the above stated date and time, did unlawfully possess a Bryco Arms .380 Caliber Pistol Serial #972878 after being convicted in Federal Court on September 12, 1989 for Bank Robbery an pled guilty was sentence 17 years & 6 months Federal custody plus 3 years supervised release. Said gun was located by Augusta Richmond County Sheriff's Investigator Paul Godden as the defendant was a passenger of a Blue 2003 Chrysler P T Cruiser having the weapon concealed between his feet. Said offense occurred at 3026 Washington Road in Augusta, Richmond County, Georgia.

And this affiant makes this affidavit that a warrant may be issued for his arrest.

SWORN TO AND SUBSCRIBED BEFORE ME
THIS 08th DAY OF July, 2004

_____
Judicial Officer

Inv. Paul Godden    A705/508
Affiant

# WARRANT

To any sheriff, deputy sheriff, coroner, constable, marshal or other law enforcement officer of Georgia -

Greetings:
For sufficient cause made known to me in the aforementioned affidavit, incorporated by reference herein, and other sworn testimony establishing probable cause for the arrest of the accused, you are hereby commanded to arrest the defendant named in the foregoing affidavit charged by the prosecutor therein with the offense against the laws of this State named in said affidavit and bring him before a judicial officer of Georgia, to be dealt with as the law directs. HEREIN FAIL NOT.

7-8-04
(Date)

_____
_____ OF CIVIL COURT

ADDITIONAL INFORMATION:

ORIGINAL

EXHIBIT A