FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA**

2005 NOV 30  AM 8: 25

**AUGUSTA DIVISION**

CLERK _L. Flbder_
SO. DIST. OF GA.

UNITED STATES OF AMERICA      *
                              *
        v.                    *      CR 105-015
                              *
JOHN EARL MILLER              *

## O R D E R

The captioned criminal matter is before the Court on the
Government's objections to the Report and Recommendation ("R
& R") of the United States Magistrate Judge ("Magistrate
Judge"), wherein the Magistrate Judge recommended that
Defendant John Earl Miller's ("Miller") motions to suppress
certain evidence be granted.  The Government contends that the
Magistrate Judge erred in his assessment of the Government
witnesses' credibility and in drawing the legal conclusion
that Miller's detention was not supported by reasonable
suspicion.  The Government has also moved for a *de novo*
hearing.  Upon *de novo* review, and for the reasons explained
herein, the Magistrate Judge's R & R is **ADOPTED** as the opinion
of the Court.  Accordingly, Miller's motions to suppress his
post-arrest statements and evidence obtained during a search
of his vehicle on July 7, 2004, are **GRANTED**.  (Doc. nos. 15,
26, 27).  The Government's motion for a new hearing is

AO 72A
(Rev.8/82)

**DENIED**.[1]   (Doc. no. 38).

The Magistrate Judge's summary of the factual contentions and testimony in this case is quite thorough, and as I have decided to adopt the R & R as my own opinion, I see no need to recount those contentions at length herein.   Rather, this opinion assumes familiarity with the R & R and the relevant facts.

The Magistrate Judge posited three bases for his R & R: 1) the Government witnesses' accounts of the events on July 7, 2004 are so materially and irreconcilably contradictory as to make it impossible to determine by a preponderance of the evidence that Miller's Fourth Amendment rights were not violated (R & R, at 12-20); 2) even assuming that the Government's most recent account of the events is true, Miller's detention was illegal, thus tainting all of the evidence and statements at issue (id. at 20-26); and 3) Miller's post-arrest statements were obtained in violation of

---

[1]   In its motion for a hearing, the Government correctly observes that the undersigned may not set aside the Magistrate Judge's credibility findings without rehearing the disputed testimony.   (Gov't Obj., at 1 (citing United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001)(per curiam)).   On the other hand, the Court may accept the Magistrate Judge's credibility findings without rehearing the testimony.   Cofield, 272 F.3d at 1305 (citing United States v. Raddatz, 447 U.S. 667, 675-76 (1980)). Although the Government is entitled to a de novo determination of the issues to which objection has been made, there is no entitlement to de novo hearing; rather, the decision to grant a new hearing is a matter committed to the Court's sound discretion.   Raddatz, 447 U.S. at 676. Based upon my own review of the transcript and the record evidence, as well as the briefing and arguments of counsel, I concur with the R & R and thus find it unnecessary to conduct another hearing.

Miranda v. Arizona, 384 U.S. 436 (1966) (id. at 27).   In
contrast,   the   Government   asserts   that   the   evidence
preponderates in favor of a finding that the second stop of
Miller's vehicle was based upon "reasonable suspicion" and
that   a   gun   was   subsequently   found   in   plain   view   in   the
vehicle, thus rendering Miller's arrest and the search of his
vehicle constitutional.[2]  I will comment further upon the R &
R's credibility determination and its reasonable suspicion
analysis herein.

## I.     The Credibility Determination

Given the Government's contention that this case presents
a simple case of plain view discovery, one might expect the
facts of this case to be relatively simple and easy to
determine.     They are not.     Instead, as detailed by the
Magistrate Judge, this case is replete with troubling factual
inconsistencies and inexplicable conduct on the part of the
police, resulting in the Magistrate Judge's uncomfortable
credibility determinations.     That is, based upon these
inconsistencies, the Magistrate Judge determined that he could
not rely upon the officers' account of the events given at
hearing.

_____

[2]    The Government does not object to the suppression of Miller's
post-arrest statements.

3

I have reviewed the transcript and the record evidence in the case, and I have independently noted all of the factual inconsistencies chronicled by the Magistrate Judge.   I am equally troubled by the inconsistencies and by the Government's attempt to minimize their effect.

The Government points out that Godden, Vincent, and Partain each testified at the hearing before the Magistrate Judge that after the officers stopped Miller's car, Vincent discovered a gun in plain view.  The Government maintains that this "consistent testimony" is dispositive of the credibility issue and necessitates that the R & R be rejected.   This argument, however, ignores the fact that there are several inconsistencies: 1) between the testifying officers' prior versions of the events, 2) between the prior versions of the events and the hearing testimony, and 3) between the officers' hearing testimony.[3]   I will not set out those inconsistencies again but incorporate herein by reference those listed in the R & R.

In an attempt to minimize the effect of these

_____

[3]   It is also noteworthy that, prior to the hearing, neither Godden nor Peebles ever indicated that the incident involved any officer other than Godden or presented the sequence of events now alleged.   Godden admittedly "glazed over [sic]" the initial encounter in his report.   All of the accounts of the incident generated prior to the hearing indicated that Godden found the gun, although they may disagree regarding whether it was seen in plain view or during a consent search.   Simply put, none of the early versions of the events indicate what the officers now aver actually happened--that an entire team of officers had stopped Miller's car a second time because of their interest in Barton before *Vincent*, not Godden, saw the gun.

inconsistencies, the Government argues that "the testimony at the hearing which contradicts the written account by Godden is indicative not of fabrication, but rather of the candid truthfulness of the officers." (Gov't Obj., at 16). The Government also attempts to account for the inconsistencies as the result of innocent mistakes and "sloppy" police work. (Id. at 15). Finally, the Government claims that the "officers did not testify evasively or offer inconsistent accounts of the way in which the gun was retrieved." (Id. at 16).

An illustration of the disingenuous nature of the Government's objections involves a key issue in the case, namely how Miller's gun was actually found. While the officers testified at the hearing that Vincent found it in plain view, I note that Godden's contemporaneous incident report inaccurately states that a consent to search had been obtained. Also, according to Peebles's sworn search warrant affidavit and sworn grand jury testimony, Godden told Peebles that *he himself* had found the gun during a consent search. (See Hearing Tr. at 108-09).[4]   Indeed, Godden's own sworn arrest warrant affidavit indicates that he discovered the gun

---

[4]   It should be noted that the citations to pages in the hearing transcript in this Order do not match those in the R & R. The Magistrate Judge had only an electronic copy of the hearing transcript as the official transcript was not yet part of the record. Unfortunately, the pagination of that copy differs from the pagination of the official transcript now in the record. I will refer herein to the testimony as it appears in the official transcript.

*himself*, and makes no mention of Vincent.   (See R & R, Ex. A,
at 1).   Thus, there are at least three prior accounts of the
events claiming that Godden, not Vincent, found the gun.
Contrary to the Government's position, these statements are
"inconsistent accounts" of the gun retrieval.   In light of the
officers' conflicting accounts of the events, I concur with
the Magistrate Judge that it cannot be determined by a
preponderance of the evidence how and by whom the gun was
found.

It also cannot go unmentioned and is thereby reiterated
that Godden and Peebles offered sworn statements in both the
arrest and search warrants and in testifying before the grand
jury, in which they left out key details and altered key
facts.   Obviously, Godden and Peebles failed to appreciate the
gravity of making a sworn statement.   Sworn statements in
affidavits and before grand juries are undertaken with the
solemn oath to tell the truth "to the best of [one's] personal
knowledge and belief."   (R & R, Ex. A, at 1).   However, the
sworn statements of these officers gave the grand jury and
state judges distorted views of the events (at least if the
officers' present version of the events is true).

Even if the officers' "candidness" regarding the
inaccurate search warrant affidavit and the mistaken grand
jury testimony are indicative of nothing more than "sloppy"

6

police work, it suffices to say that this "sloppiness" has made it impossible to determine what occurred with any great confidence.  And of course, sloppy or careless police work--notwithstanding an officer's good intentions--often does violate the Fourth Amendment.[5]

Taken as a whole, the officers' conduct and prior statements do not engender confidence in their testimony.  For instance, Godden's shift from his earlier accounts to one in agreement with Vincent's hearing testimony calls into question all of the officers' credibility.  Whatever their explanations, I will not embrace the Government's apparent willingness to allow these officers to come into court months after the fact and tell a different story from the one they have already told a federal grand jury and a state judge.  In fact, it seems the officers may never have told even the prosecuting attorney the whole story.  The Court draws this inference from the fact that the Government's filings in this case, offered prior to the hearing, also contradict the hearing testimony.  Throughout the earlier proceedings, the

---

[5] See, e.g., United States v. Sears, 411 F.3d 1124, 1125, 1131 (9th Cir. 2005)(affirming suppression of evidence illegally obtained during a "search pursuant to a warrant that, due to police error in preparing the document for distribution, contained eight words not reviewed by a neutral magistrate," and noting, "we do not condone the sloppy police work that resulted in the violation of Sears's Fourth Amendment rights"); United States v. Valenzuela, 365 F.3d 892, 902 (10th Cir. 2004)("Careless police work does not justify dispensing with the Fourth Amendment."); United States v. Anderson, 851 F.2d 727, 730 n.1 (4th Cir. 1988)("[S]loppily prepared or executed warrants directly affront the Fourth Amendment.").

Government argued that the search was incident to arrest *or* based on consent, without fully committing to either factual theory. (See doc. no. 28, at 2-3). For example, prior to the hearing, the Government described Godden's encounter with Miller as follows:

> Inv. Godden approached the car a second time. Godden noted that in the middle of a hot Augusta July, Miller was dressed in a long sleeve blue jumpsuit, which he wore over shorts and a T-Shirt. Godden was aware that a white male was wanted in several recent armed robberies in the Augusta area . . . . During a consent search of the PT Cruiser, other items . . . were located.

(Doc. no. 28, at 2). This account contradicts Godden's assertion at the hearing that he never "suspect[ed] Mr. Miller of anything" until after Vincent had discovered the gun. (See Hearing Tr. at 35). More importantly, the filing indicates that a consent search was performed. Yet, at the hearing, the officers testified to a plain view discovery. Moreover, prior to the issuance of the R & R, the Government consistently argued that the entire incident, up until the discovery of the firearm, was a "consensual," "non-coercive" encounter. The Government has abandoned this contention in its objections, now agreeing with the Magistrate Judge that the second stop was a detention, although arguing that the second stop was nevertheless based on reasonable suspicion. In sum, the hearing testimony presented an account of the events contradicted by previous accounts, and not anticipated by the

8

Government's filings in this case.

At bottom, the Government urges the Court to accept its witnesses' testimony uncritically. Police officers, however, are not entitled to a presumption of credibility or any greater deference than that afforded to other witnesses. It is the Court's responsibility "to make sure the testimony of police officers is given the same critical scrutiny given to a defendant's testimony" and "to make sure that police officers act appropriately and not abuse the power legally afforded to them by, among other things, carefully scrutinizing a police officer's testimony." United States v. Hill, 195 F.3d 258, 267 (6th Cir. 1999)(internal quotation and citation omitted). In evaluating the constitutionality of a detention, the Court "is free to examine the sufficiency of the reasons for the stop *as well as the officer's credibility*." United States v. Johnson, 63 F.3d 242, 247 (3d Cir. 1995)(emphasis added).

In fact, it is the Court's duty to independently examine the officers' credibility and the lawfulness of their actions which underpins the safeguarding power of the Fourth Amendment's warrant requirement. See Wong Sun v. United States, 371 U.S. 471, 481-82 (1963)(stating that probable cause determinations shall be made by a neutral magistrate to "insure that the deliberate, impartial judgment of a judicial

9

officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause"). Here, where the officers acted without a warrant, the same Fourth Amendment principles must apply with even greater force, as the burden is on the Government to prove that a prior intrusion upon a citizen's rights, undertaken without judicial approval, was justified.

The Court notes that the strength of the Government's position is that the hearing testimony has only been positively controverted by Miller in his affidavit, which is so brief as to border on being merely conclusory. (See Gov't Obj., at 17). But here the Government misapprehends its burden. Miller does not have to controvert the Government's account of the events or "establish" a constitutional violation if the Government has not shown what occurred by a preponderance of the evidence. Although it is a close issue, here the Court has ample reason to conclude that the officers' testimony is incredible because it contradicts the prior sworn and unsworn statements of Godden, Peebles, and Miller.

Finally, it perhaps bears repeating that Godden's prior accounts of the events are of vital importance. He was on the scene, he took pictures of the seized evidence, he took notes cataloging the seized evidence, he prepared the only written report, and he produced a near-contemporaneous sworn

10

affidavit.  Also, it was his initial stop of Miller and Barton in the PT Cruiser which began this entire affair.  If Godden's credibility is assailed by inconsistencies, Miller's contentions of a search without consent or probable cause become more credible.  Under such circumstances, the Government has not proven by a preponderance of the evidence that Miller's seizure and the search of his vehicle did not violate the Fourth Amendment.

## II.   The Reasonable Suspicion Analysis

The Magistrate Judge concluded that, even assuming the officers' account at the hearing is true, they did not have reasonable suspicion to renew their detention of Miller and Barton after Godden initially let them go.  I concur with this conclusion and adopt the Magistrate Judge's reasonable suspicion analysis as my own.

In adopting the analysis, I must note that the Government attempts to compare this case to several cases which bear little resemblance to the facts of the case at bar.  The Government attempts to analogize this case to the following federal cases:  United States v. Gordon, 231 F.3d 750 (11th Cir. 2000), United States v. Dawdy, 46 F.3d 1427 (8th Cir. 1995), Briggman v. United States, 931 F.2d 705 (11th Cir. 1991), United States v. Landry, 903 F.2d 334 (5th Cir. 1990),

11

and <u>United States v. Constantine</u>, 567 F.2d 266 (4th Cir. 1977). These cases are not especially enlightening, however, because none of the cases involved resumption or re-initiation of detention after the initial suspicion justifying the stop had been dispelled. More particularly, all of the cases cited by the Government share certain facts not present in this case: (a) upon initial sighting or detention, the defendants took actions which generated, rather than dispelled, reasonable suspicion (*e.g.,* took flight, gave unsatisfactory answers to questions, *etc.*); (b) the police officers in the cases took reasonable steps to limit the scope and length of the detention, which is to say, they did not let the defendants go; and (c) all of the plain view sightings occurred very soon after the initial stop, and before the officers' suspicions had been dispelled.

Additionally, the Government's attempt to undermine the Magistrate Judge's legal conclusion fails. First, the Government argues that <u>United States v. Pruitt</u>, 174 F.3d 1215 (11th 1999) and <u>United States v. Boyce</u>, 351 F.3d 1102 (11th Cir. 2003), relied upon by the Magistrate Judge, are inapposite because they involved prolonging a detention without justification when the purpose of the initial stop had ceased. The Government argues that, in contrast, the discovery of Barton's criminal history, when coupled with her

12

location, amounted to "new information" justifying "a new investigatory stop." (Gov't Obj., at 11). Thus, the crux of this case is whether the Magistrate Judge correctly determined that Barton's criminal history (which involved cooking methamphetamine at hotels) and presence at a Days Inn did not generate reasonable suspicion to resume the detention.

Here, the Government proffers its best argument. In its objections, the Government points to four facts as sufficient basis for reasonable suspicion: 1) the hotels on Washington Road, including the Days Inn at issue here, were known for drug crimes--including methamphetamine manufacturing; 2) Barton had been convicted of manufacturing methamphetamine in Washington Road hotels; 3) it was 9:00 p.m.; and 4) the car was located in a secluded, wooded area not ordinarily used by motel guests. (Id. at 7). Although a close issue, the Court is satisfied that the Magistrate Judge's initial determination that these facts did not give rise to reasonable suspicion is correct.

First, the Government's reliance upon the initial sighting in the wooded area is misplaced. Godden had already investigated the matter and determined that Barton and Miller were not up to anything illegal while in the wooded area. Thus, Godden was aware of no reason to stop Barton and Miller at the time he let them go and radioed the rest of the narcotics team. In addition, Barton's presence in a wooded

13

lot, while generally suspicious, did not lend itself to the suspicion that she was cooking methamphetamine in the Days Inn. Rather, a secluded lot offers privacy to consummate some other type of illicit activity, such as a drug transaction, or, as Godden initially suspected, a prostitution transaction. Moreover, when Partain ordered Godden to stop the PT Cruiser, he only knew that Barton, with her criminal past, was at the Days Inn and not in the secluded wooded area. (Id. at 73-75).[6]

In fact, Partain explained that the *only* reason he ordered the stop was because Barton was in the car. (Id. at 77-78). Indeed, Partain himself stated that there was no indication that Miller and Barton were involved in criminal activity. (Id. at 80 (Q: "At the time she was stopped, when you came up to the car, was there any indication that either she or Miller were involved in criminal activity? A: "No, not at the initial point.")). Partain also knew that Godden had investigated the situation, determined no crime was afoot, and released Barton and Miller. (Id.). Thus, the episode in the secluded lot, which was concluded without incident and resulted in the dissolution rather than the arousement of reasonable suspicion, is immaterial.

---

[6] The Court notes here that Partain inexplicably mentions, "We were paying more attention to things in the room and decided to go back there." (Id. at 75). This strange statement raises yet more unanswered questions regarding this case. What room?

14

Likewise, the fact that this episode occurred at 9:00 p.m. seems immaterial. I am generally familiar with the area, and I do not find it peculiar that citizens may be in a hotel parking lot on Washington Road—arguably the busiest street in the city of Augusta—at that hour. Also, the Days Inn's alleged status as a high crime area alone is insufficient. As in United States v. Davis, 94 F.3d 1465, 1470 (10th Cir. 1996), Miller and Barton could easily have had a legitimate purpose for being there. In fact, upon questioning by Godden, Miller and Barton offered an innocent explanation for their presence which resulted in Godden's decision to allow them to leave.

Thus, it is only Barton's identity and unique criminal history which appear to be material. Nevertheless, the Court is not convinced that Barton's criminal history and presence at the Days Inn amounted to reasonable suspicion—especially when one recognizes that an initial investigation and detention revealed *nothing.* There was no "particularized evidence," to use the terminology employed by the Fourth Circuit in United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997) and adopted by the Court in the R & R (p. 24).[7]  The

_____

[7]   The Government took umbrage at the Magistrate Judge's use of Sprinkle. (Gov't Obj., at 12). First, the Magistrate Judge relied upon Sprinkle for a general principle of law—the need for "particularized evidence"—and the proposition that a drug offender's presence in a high crime area alone does not provide reasonable suspicion. Also, Sprinkle, while not on all fours with the instant case, is more analogous than any case cited by the Government. First, Godden, like the officer in

15

mere fact that Barton had returned to the scene of her prior crimes is not reliable indicia that a crime was afoot.  First, although apparently a drug-crime infested area, I have already noted that Washington Road is arguably the busiest street in Augusta.  If Barton had returned to a dangerous area full of abandoned buildings frequented only by unsavory characters, as in Gordon, 231 F.3d 750, this would be a very different case. Nonetheless, a hotel parking lot is not an inherently suspicious place to be at 9:00 p.m., without some other basis to suspect criminal activity.  Here, any basis for stopping Barton was dispelled by Godden.  The discovery of Barton's identity, without more, did not entitle the officers to stop her again.

More importantly, even if Barton's criminal history provided reasonable suspicion to stop her, it is not apparent to the Court how that information justified detaining Miller. As an aid in further evaluating this case, the Magistrate Judge properly cited United States v. Starks, 301 F. Supp. 2d 76 (D. Mass. 2004), as a remarkably similar case.  The Starks case--alone among all the cases cited in the R & R or in the Government's objections--addresses a crucial issue:  the circumstances under which the police may continue or resume

Sprinkle, was able to walk up to the car and dispel his suspicions. Second, at the time of the second stop, Barton and Miller were in a public parking lot, a place they were legally entitled to be.  Finally, both cases involved recently released drug offenders.

16

detention of a car passenger because of their suspicions regarding the driver.

In Starks, the district court explained that the officers could not detain Starks, the passenger, after the purpose of the initial stop had been completed.  301 F. Supp. 2d at 83. The only new information used to detain Starks and the driver was the driver's involvement in a pending drug case.  The court noted that even if that information generated sufficient cause to detain the driver, it did not entitle the officers to detain Starks.

> Even assuming that those concerns--the early morning hour, the location known for drug activity, and Crosby's pending drug trafficking case--could generate new reasonable suspicion as to Crosby [the driver], they could not constitute reasonable suspicion as to Starks.

Id. at 83-84. Thus, Starks's detention became unlawful before he was ever frisked.  Id. at 84 n.7.

The situation in the instant case is similar.  Godden dispelled his initial suspicion, but the officers resumed the detention of both Barton and Miller when they learned of Barton's drug-related history.  However, as in Starks, the officers' suspicions regarding Barton, the driver, had "no nexus" with Miller, the passenger.  See id. at 84.  Indeed, none of the officers suspected Miller of anything until the gun was found.  The officers detained Miller based solely on Barton's location and identity.  Even assuming this gave them a basis to resume Barton's detention, they had no reason to

17

detain Miller.  Accordingly, Miller's detention became illegal before the gun was sighted.

## III. Conclusion

Upon the foregoing, the Court **ADOPTS** the Magistrate Judge's R & R in its entirety.  Miller's motions to suppress his post-arrest statements and evidence obtained during a search of his vehicle on July 7, 2004, are **GRANTED**.  (Doc. nos. 15, 26, 27).

**ORDER ENTERED** at Augusta, Georgia this 30th day of November, 2005.

_____
UNITED STATES DISTRICT JUDGE

18